2011-12-32 SINOPHIA VENTIS & ALBANY MOLECULAR RESEARCH v. DR REDDYS LABORATORIES Mr. Berghoff. Thank you, Your Honors. May it please the Court, the sole claim at issue in this appeal, Claim 7 of the 906 patent, has not a word in it relating to purity. The claim is to a process for making hexafenidine, that's the end product, by reacting two chemical compounds. The first we have referred to as CPK. It's referred to in the claim as the regioisomer. Mr. Berghoff, you're going to have to explain why the emphasis in the specification on substantially pure doesn't apply. Are you saying that the claim should be interpreted to cover extremely impure product, whatever that means, or that there's more to it than that? Yes. It should be construed broadly to not require any particular level of purity for any of the three chemicals cited in the claim. Hexafenidine, the end product, azacyclinol, the co-reactant, and especially the regioisomer CPK. And the reason is that it is not essential. The purity of the CPK is not essential to the patentability or validity of this patent. The prior art, as discussed in the specification, is the use of a different reactant, which we have called in the briefing CKE, an entirely different compound from CPK, to make hexafenidine. And the problems that arise with the use of CKE as the starting material, as opposed to CPK... The CKE is the car process? That's the car process, yes, Your Honor. And the problems that arise using CKE instead of CPK are discussed in columns two through four of the specification. But the patent never, our patent specification, never disparages or comments on the use of less than substantially pure CPK as being a problem or as being outside the scope of the invention. Well, I was waiting for you to say that, because it does seem to me that you've got... That's where you start running into problems. And let me just quote a passage that I'm sure you're very familiar with from column 11, lines 34 through 36. The papiridine derivative compounds of the present invention are prepared by providing a substantially pure regioisomer of the following formula. That language, of the present invention, suggests that that is what the invention is, not that that is an embodiment. And therein, in addition to a number of other references throughout, but that seems to me the strongest one in the specification. That's your problem in this case. How do you get around it? Easily, Your Honor. Well, you know, lawyers come up and say this is an easy case over and over to us, and I wish they wouldn't do that, because you know, and I know, and we all know, this is not such an easy case. So let's not play games. I should not. I apologize for that. But I think, how about in a straightforward manner? Good. Thank you. Much better. The sentence that Your Honor refers to, and that the appellee cites numerous times in their proof, is in the description of the detailed embodiments. That's the first point. And the very first section of that focuses our attention on what's being discussed in that entire section. And this is at Column 6, under Detailed Description of the Invention. It states that the present invention relates to substantially pure hyperidine derivative compounds, and that would be to substantially pure fexofenadine in the context of our claim. And that is what the statement at Column 11 is referring to. If you want to make substantially pure fexofenadine, which is the preferred embodiment, the preferred end product, you use substantially pure regioisomer, substantially pure CPK. That's what that sentence is saying. But also, Your Honor, as a second point, let's look at what is being referred to as the present invention in that sentence. It's not the process. It's talking about the piperidine derivative compounds of the present invention. That's what the focus is. How do you prepare those? And those compounds were claimed in the related patent, 610 patent, which is cited in the appendix at 1968. Those claims are limited to substantially pure fexofenadine. The third point, Your Honor, is as we continue in the description of the preferred embodiment, we get to the portion that would be of most interest to a chemist, to a person of ordinary skill in the art, reading this specification. And that's Example 2. That is the only example that would tell a chemist in detail how to make CPK, according to the invention. And of significance, the title, and of course we're here at the bottom of Column 16 in the title, for example, 2, does not say preparation of substantially pure CPK. It makes no mention concerning the purity of the CPK that's to be made by the example. You're on Column 18, right? Column 18. But it's still within the description of the preferred embodiment, as was the statement in Column 11. And this, I believe, is where the District Court erred, among other spots. The District Court found that there was no reference in the specification to anything other than substantially pure CPK. Well, here it is. I have to respectfully beg to differ with the District Court. Here is a reference in the title to preparation of 4-Cyclo, and it's the long chemical name, but that is CPK. There's no reference to substantial purity or any purity. And indeed, if we turn the page in the patent to Column 19, to the very bottom of that example, we see that there is no disclosure that would be of interest to a chemist as to the purity of the compound that results from Example 2. Instead, all it tells us is that Example 2 affords 10.6 grams of an oil. There is no measurement of purity. There's no melting point. There's no elemental analysis. And indeed, we do not get one in the detailed description here in the examples until we get to Example 7. And Example 7 is how fexofenadine is made through this series of reactions. Finally, in Example 7, in Column 20, we do get a statement, clear statement, that the sample has a particular melting point. Well, that tells a chemist about its purity. And we get a particular analysis for the elements in fexofenadine, and that too is going to give a chemist personal skill in the art, a clear indication of purity. But Example 2, which is where the rubber meets the road in terms of whether or not the term CPK or regioisomer of the following formula should be limited in purity, says nothing about purity. Example 2, the 33% is the overall yield? That's correct, Your Honor. That's exactly right. But the other products wouldn't include the meta-isomers, for instance. Is that accurate? Well, the title here is referring to the para-isomer, as is the formula in Claim 7. It's actually in Claim 1. It's referring to the para-isomer. But one can make the para-isomer in any level of purity. One can make it 100% pure. One could make it substantially pure. One could make it impure. This example does not state anything impure. Why would you want to make it impure? Why would you want to make it impure? In the preferred embodiment, you would want to make it pure. But we're talking here about whether the invention should be limited to substantial purity or not. And there's no reason to do so with respect to the prior art, because there is no prior art that shows making fexofenadine with CPK. The prior art is starting with an entirely different compound. So this is not a distinction that is relevant to patentability. It is not a distinction that was raised in the specification. The specification never disparages the use of impure CPK versus substantially pure CPK. And that's a fact pattern that we see in many of the court's decisions, where the specification is used to add limitations to the words of the claim, plain meaning of the words of the claim. It's not here. Likewise not here is any statement, any positive statement, as we see in many of the court's cases, that substantially pure CPK must be used. What is – I think we may have alluded to this earlier, but I just want to make sure I understand your position on this. And I understand this isn't the core of your argument, but what do you understand the patent to contemplate by the term substantially pure? This is an issue in a related appeal that will come up later. Our position on that is largely but not wholly CPK, and that that would be – it does not have a hard numerical basis. More than 50%? Well, that probably would not be largely. I don't think that would contemplate it. But it does not, as this court's jurisprudence permits, does not have to have a hard, precise, knife-edge numerical boundary. The use of substantially in claims is well established and appropriate, and we believe it's largely but not wholly. But the fact that the district court then took, again, in a claim that doesn't make a single reference to purity anywhere within its four corners, jumped to the conclusion that it had to be 98% pure with respect to all impurities. 98% is found nowhere within the four corners of the specification. He used the evidence that 98% was more or less standard for pharmacologically pure pharmaceuticals. Did he not? Yes, he did, Your Honor. And that is referring to the end product, the faxophenidine. But there is no requirement by the FDA or by any regulatory authorities that there be a particular purity for an intermediate. No, I led you down this path, so perhaps it wasn't the path that you intended to follow. But I did not understand your brief to make a separate argument with respect in the alternative, should you lose on the requirements that substantially pure being in the claims. I didn't understand you to make a separate argument that the court was wrong about the 2%. Well, I believe we did. We did not suggest. Where in your brief do you have that? I don't have it. Well, perhaps you can find it. Because I looked and I didn't see it, but I could well have read over it. Well, I'll defer to Your Honor's review. Our core argument, you correctly. Sure, I understand that. I've just seen no limit to purity. Understood. Thank you, Mr. Bruecker. Good morning, Your Honor. Good morning. We believe that, and as we've stated in our brief, that if this specification could speak, it would tell the court and anybody reading it that this invention is about making piperidine derivatives using substantially pure CPK. Your Honor cited to one passage. I'd like to address briefly Mr. Burghoff's comments regarding example two, which was the crux or the primary part of his argument. Well, before you get there, and I don't want to throw you off the argument, but I do have a preliminary question just to get the lay of the land here. You don't have any question, I take it, that as a matter of claim construction, if these claims had simply said, well, claim seven in particular, had simply said a process, according to claim six, wherein the hydroxylated piperidine derivative, whether substantially pure or not, has the formula, colon, that the substantially pure requirement would go poof and be out of the case, correct? You mean if the words whether substantially pure or not were in the claim? Right. I would agree. Sure. If there was clarity, assuming it was supported by the spec and wasn't put in a later claim. Well, but that's a validity question, right? Agreed. And this court has commented on that many times, I think most recently, in that retractable en banc review that issue has come up. So the question for us is whether we ought to treat this claim language as if it had that language in it, right? Isn't that really what we get down to? Absolutely. But I don't think you have to go to this validity question to get there, Your Honor. Well, no. Validity isn't before us. Correct. So it's all a question of claim construction right now. I agree. So then taking a case like Liebel, Liebel-Flarschein, which is a pretty analogous sort of situation. That was the single embodiment case, if I recall correctly. Well, not just that. That was a case in which the first patent had been limited, and after the patentee saw that the commercial embodiment came out that was something other than what was in the first patent, the prosecutorial continuation, that took out the required element. So it's parallel to this case in some respects. And we held that given all the circumstances, it looks as if the patentee had done just exactly that, which is to take out the limited language that was in the first patent and, in effect, broaden the patent. It so happens that in a later case, that patent was held invalid on the basis of lack of support. But as far as the claim construction, that's what we said. And your opposing counsel relies on that case. Why isn't that this case? Well, for a few reasons. What's different from Liebel to this case? First of all, what I think is different is, number one, Your Honor cited one of the portions of the spec, but there are several, that talk about the present invention. And this court has a line of cases that say when you refer to something as the present invention, that's a kind of signal that this is important, this is essential to the invention, and you can't ignore it. How do you distinguish that when they were talking of the present invention, they were discussing the final product, but these are all process claims? That's true. These are all process claims made, we say, with a substantially pure CPK. We say that's a requirement to carry out the process as taught in this patent. If I may just get back to the question of the Liebel-Forschheim, I think this case, frankly, is more correctly addressed as kind of the flip side of Your Honor's decision in the Saunders case. That case, if you recall, had to do with a pressure-activated seal in a pneumatic cylinder. And in that case, you found there was not a claim limitation. But you went through the factors that this court has recognized as supporting a situation where there will be a term read into the claim, so to speak. And here we're not really importing something into the claim. Let's be clear on that. The picture of the pararegioisomer is in the claim. It doesn't say substantially pure, but it's shown as the pararegioisomer. It's not shown as the mixture, which is clearly shown in the patent. For example, if you look at column 12 of the patent at lines 40 to 45, you can see that when they wanted to show a mixture of a para and a meta, the line going from the left substituent to the benzene ring goes into the center of the circle. When it's the 4 or para position, it's what's shown in claim 1. And if it were in the 3 position, it would be the meta. This means the mixture. And this is also important because it goes to the point that Mr. Burghoff raised about example 2. Right after the specification talks about the fact that these are the various piperidine derivatives that can be used made in accordance with the invention, it goes on to say, as Judge Bryson pointed out at column 11, that the piperidine derivatives of the present invention are prepared. And Chief Judge Brown in New Jersey said, doesn't say may be, doesn't say can be. Says are prepared by using a substantially pure regioisomer of the formula. And then it goes on at the bottom of that same column 11, it says there are several techniques of providing these substantially pure regioisomers. And it goes on at the top of column 12, process 1. Now, process 1 takes us through a mixture to get to the substantially pure. That's why it's shown there. And that's all that example 2 is about. If you read the examples at the end, 1, 2, 3, 4 up through, I think it goes through 12, you will see that 1 through 7, and he referred to 7 as being one with purity, each one says, after example 1, example 2 says, now you take the compound of example 1 and you do the following. And example 3 says you take the compound of example 2 and you do the following. And so on until you get to 7. So it's nothing more than an actual chemist's description of what's shown here of these three processes for making the substantially pure regioisomer. Then you have the problem where if you get a statistical mix of two meta and one para, then the ordinary product would be, as it says, one third para. So to say, therefore, you take the giant step to 98% in order to have a more pure product looks like quite a leap. Why wouldn't substantially pure be anything more than over half, for instance? Here, why we believe that's very clear. And here, I think they've distorted, and I think we tried to clarify what Judge Brown did in his opinion, in his Markman opinion. As Mr. Berghoff pointed out, he addressed two patents in that opinion. First, he addressed the 703 patent, which does have the word substantially pure in it, admittedly. And he went through, the question was, what does it mean? And he looked at the file history, and he said that substantially pure in the file history, according, for example, in the 610 patent prosecution history, they argued that substantially pure meant 98% purity. And they did that with respect to claims. There was a set of claims in that interference. There were 1 through 17. Some of the claims, admittedly, were the piperidine derivative. But claims 12 through 17 were limited to the CPK intermediate. They made no distinction. They said substantially pure as used in those claims, 1 through 17 means 98.3%, or 98%, excuse me. And then, when he got to the 906 patent, he said, okay, does the CPK have to be substantially pure in these claims? And he said the answer to that is clearly yes, it does, based on all the narrowing statements in the specification, and the reading of the spec as a whole. He said, yes, it has to be substantially pure. And then all he did was he said, well, I already found that substantially pure means 98%, and there's no basis, and this is key, he said there's no basis for distinguishing between substantially pure as used for the piperidine derivative end product, or the CPK intermediate. If you read the spec, they never say substantially pure means different things in different contexts. That's attorney argument. And it's contrary to what they told the patent office when they had that set of claims in the 610 that included both the piperidine derivative and the CPK, and they said substantially pure was used for both terms in those set of claims, and they said it means 98%. They never said it means 98% for just the piperidine derivative end product or just the CPK. They applied it to all the claims. So Judge Brown took them at their word, and that's what I understand the prosecution history is for. If you make statements like that, you can't come in later in court and argue that somehow this does not apply. This is what they told the world, and I think they should be bound by it. And so did Judge Brown. So I think it's very clear that several things. First of all, they criticized the prior art in Column 4 for not being substantially pure, for not having regioisomeric purity at each stage along the way. That's a criticism of what they do. Secondly, the claims in the 906 patent as compared to the 703, they're not identical. If they were identical, for example, Judge Bryson, if, for example, they had taken exactly Claim 1 of the 703, which said substantially pure, and reproduced it in the 906 patent Claim 1, then you'd have two claims that would be identical if you accepted my argument. But they didn't do that. They made other changes in Claim 1 of the 906. They limited the… They limited to the hydrogen from… Correct. The substituents on the benzene ring all have to be hydrogen, which is not a limitation in Claim 1 of 703. So in one respect they narrowed it, and in another respect they broadened it, is the argument. That's their argument? Yeah. Yes. Right. And why does the fact that they narrowed it in one respect somehow undercut the inference that they broadened it in another respect by taking out language that previously was there? It doesn't necessarily undercut it. That wouldn't be how I put it. The only point I was making is you don't wind up with two identical claims under our argument. No, but as to the core distinction for our purpose, you've got a claim in an earlier patent that has the word substantially pure and is otherwise largely similar, if not completely identical, to the claim in the later patent, which doesn't have that language. If this were a statutory construction case, we would attach some significance to that fact. And the question is, why shouldn't we attach significance to that fact in this case? Again, because I think that the relevant issue is what does this spec tell you the CPK has to be? And I think when you look at that question, the CPK has to be substantially pure. But we agreed at the beginning that the spec would have no significance if the language in the claim made it clear that it didn't have to be substantially pure. So what if there's something on line 11 that talks about this invention? If the language in the claim was clear that this invention language was too narrow, that this invention language would go away, as we agreed. So the question really comes down to, can you read in light of the context, the way these two patents were prosecuted, can you infer that the word substantially pure should be effectively not read into the second patent? And you say you ought to read those words as read into the second patent. And the question is, other than the emphasis in the spec, what is it that drives us to that conclusion? Because I think as your opposing counsel said, it's not as if this isn't patentable subject matter without that language, right? Yeah, I don't think that's the question. No, but that's important. I mean, obviously, if that were really important to the patentability of this invention, then suddenly you've got a major problem in trying to do without it. Well, first of all, I'm not sure that question was ever addressed. That's attorney argument saying this is patentable subject matter without it. I don't know that that was ever actually addressed anywhere, where somebody came out and said, if you don't have substantially pure, it's still patentable. I don't see that in the record. That may be right. But in any event, that's not the distinction that was drawn to, say, car or anything else. There was never a point in which anybody said that the reason that this invention is patentable is because of the substantially pure element, right? Well, not entirely. I mean, in paragraph four, they do distinguish car. It's true car used a different intermediate material, which is never really mentioned there. But the basis they used to distinguish it is on the basis of regioisomeric purity, that you can't get regioisomeric purity with the car process. And they say that right at column four at lines 15 to 23. They make that very distinction. Here's what's great about ours. We can get regioisomeric purity. That's what we achieve. Yeah. Our process can result in regioisomeric purity, but that doesn't mean that our claim is limited to regioisomeric purity, right? Or am I missing something? Help me if I'm missing the chemistry here. The point is that the prior art criticizes the inability to achieve regioisomeric purity. And I think the specification makes clear throughout that what their invention was, was using substantially pure CPK to get that regioisomeric purity. That's their invention. That's how they described it. And that's what it should be limited to. I don't see how you can just all of a sudden relook at the spec later when you're unhappy with what you described as your invention and now walk in and say, okay, well, let's take that word out. If we can't get these guys infringing on it, let's just take it out. Well, that's not their invention. That's not what they described. The only thing they described, and I defy anybody to find a description of making anything or a suggestion of making any end product without using a substantially pure CPK. Everywhere it's mentioned in here, it's called substantially pure. It says the compounds are prepared using substantially pure. Every example is substantially pure. I realize that's not in itself, but all of the other things together, based on the precedent of this court, should limit these claims to what they described as their invention, and that invention is using substantially pure CPK to make piperidine derivative compounds. No question. Well, if that's the only way of making a product, and if that's what then Dr. Reddy's labs is, the process that is intended to be used to make the product, then it's hard to see where the distinction lies. They're saying that if the claim were valid, it would be infringed? Not at all. No, we're not. It turns out that it's complicated, but basically we don't use this process to make it. They claim we use the process. We say we're happy to fight that battle, but we don't have substantially pure CPK anywhere in our process. Using the 98% value for substantially pure, or the 33% plus, or what? Using any of that. We do not use substantially pure CPK. There are alternative ways to make this. Sometimes CPK is formed as a byproduct in very small quantities if you use other processes. Then why was this patent put into issue at all? Because they believe that we were infringing the patent, and initially— But you had to provide a paragraph for a statement about this patent, but did you not? This is a process patent, so they're not covered technically by the Orange Book, process of making. They're not in the Orange Book, so you don't provide a paragraph for a statement on these patents. If it doesn't come under the Hatch-Waxman Act, how can there be an action for infringement? Because we're selling. We actually market a generic— So this is just a traditional infringement action? On this patent, it's a traditional. That's right. There were Hatch-Waxman Actions. I didn't mean to mislead you. There were several. There were like nine patents in this lawsuit, and many of them were Hatch-Waxman cases before we did this patent. I'm sorry. I should have made that clear. My apologies. Okay. Yeah. The only other point I also want to make, just going back to those examples for a second, is that Judge Brown looked at those examples at the very end, the 2 through 1 through 12, and made it clear that he understood that those examples, based on the testimony of their own expert and the inventor, lead you through substantial purity. And we cite to the deposition testament of the sole inventor here, Dr. Damber, at A2780, where he acknowledges that everything after example 2, he talks about the fact that they get—it's directed to a substantial purity. He admits that. He's the inventor. He's the only guy. He did the work. Unless there are further questions. Any more questions? Any more questions? Thank you, Mr. Verlaine. Thank you. Mr. Berghoff? If I could start by addressing the Liebel-Flarschein case that Judge Bryson brought up. I believe that case is spot on here. In the Liebel-Flarschein, the claims were amended during prosecution to eliminate the requirement of the claims for a pressure jacket, just as the claims that are on appeal—the claim that is on appeal here was amended going from the 703 patent to the 906 patent to take out the requirement that the CPK regional isomer be substantially pure. And that amendment by the court in Liebel-Flarschein was indicated to be a strong indication that the applicants intended those claims to reach injectors that did not use pressure jackets. And the same conclusion would apply here. The fact that the limitation substantially pure was removed from the claim here on appeal in the 906 patent, as opposed to its grandparent patent, 703, is a strong indication that the claim should not be limited to any type of purity with respect to the regional isomer. With respect to the specification, there is no statement in the specification that the process of the present invention should be limited to substantial purity. I do think that there is a distinction from Liebel, and we have to acknowledge that Liebel pointed out that there was no disclaimer of any sort in Liebel on whether it was the no pressure jacket or pressure jacket, in any event. Whereas here, the argument is that there is an express limitation of the invention to substantially pure in the course of the specification. And our position is that the specification does not create the manifest words of restriction or exclusion with respect to the claimed process. All of the citations cited by Apolli that refer to the present invention do not refer to the process of the present invention. They refer to the end product, and they do refer to the fexofenadine as being substantially pure. But the district court found that because there are other spots in the specification that don't refer to fexofenadine being substantially pure, that he did not find that the end product had to be of any particular purity. So we end up with the district court's construction not making any chemical sense that you can use this process to make impure fexofenadine, but you have to start with this highly pure, substantially pure starting material. It makes no sense. The 906 patent speaks or expresses contemplates a use for animals, especially to treat warm-blooded animals, birds. How does that relate to the purity issue? Well, there may be different requirements for veterinary use for purity of the end product than for human use. Is that important? I don't believe so because that refers to the end product, the fexofenadine, and the purity of it at best, not to the purity of the CPK, which is the starting reactant. One could use impure CPK to make fexofenadine, and, indeed, we believe that's exactly what Dr. Reddy's does. They use slightly impure CPK, less than the 98%, to make their product. You just have to do more purification on the back end to make fexofenadine up to whatever standard it may be, the veterinary standard or the human standard. Any more questions? No further questions. Any more questions? Thank you very much. Thank you both, Mr. Berghoff, Mr. Pavane. The case is taken under submission. That concludes the argued cases.